Robert R. KOEFOOT, M.D., Richard G. Hanisch, M.D., M.D. Mathews, M.D., and Board of Trustees of Howard County Community Hospital, Plaintiffs,

v.

AMERICAN COLLEGE OF SURGEONS, Dr. C. Rollins Hanlon, and Dr. Frank Padberg, Defendants.

No. 81 C 4333.

United States District Court, N.D. Illinois, E.D.

July 25, 1988.

William J. Sneckenberg, Jonathan D. Moses, William J. Sneckenberg & Associates, Ltd., Chicago, Ill., for plaintiffs.

John J. Cassidy, Jr., Douglas J. Polk, Susan G. Feingold, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

## I. INTRODUCTION

This opinion follows a trial to the Court of the plaintiffs' claims against the defendants pursuant to the Illinois common law governing membership rights in voluntary associations. In a Memorandum Opinion and Order dated December 30, 1986, the Court bifurcated the plaintiffs' claims against the defendants into two segments: segment one was a trial of the plaintiffs' antitrust claims to a Jury and segment two was a bench trial to the Court of the plaintiffs' state law membership rights claims. By stipulation filed on December 31, 1986, the parties agreed that there were no disputed issues of fact for jury consideration common to both segments one and two of the trial. On March 5, 1987, the Jury returned a not guilty verdict in the antitrust segment of the trial.

This opinion contains the Court's findings of fact and conclusions of law with respect to segment two of the trial—the trial to the Court of the plaintiffs' membership rights claims. Other published opinions of the Court, all concerning pretrial matters, are found at 610 F.Supp. 1298 (N.D.Ill.1985) and at 652 F.Supp. 882 (N.D. Ill.1986).

## II. FINDINGS OF FACT

1. Plaintiff Robert R. Koefoot, M.D., is a general surgeon residing in Grand Island, Nebraska. Grand Island is a city of 35,000 people located in central Nebraska. Dr. Koefoot has been licensed by the State of Nebraska continuously since 1947 and by the State of Minnesota since 1948. He practices surgery at three hospitals in Grand Island: Lutheran Memorial Hospital, St. Francis Hospital and the Veteran's Administration Hospital. Dr. Koefoot also practices surgery at Howard County Community Hospital in St. Paul, Nebraska.

2. Plaintiff Richard G. Hanisch, M.D., is a general medical practitioner engaged in a solo practice in St. Paul, Nebraska. He is licensed by the State of Nebraska and permitted by law to provide all types of medical care, including surgery. St. Paul is a community of 2,000 people located twenty miles north of Grand Island. Dr. Hanisch routinely refers his patients requiring general surgery to Dr. Koefoot unless the patients express a contrary preference.

3. Plaintiff M. D. Mathews, M.D., is also a general medical practitioner engaged in a solo practice in St. Paul, Nebraska. He is licensed by the State of Nebraska and permitted by law to provide all types of medical care, including surgery. Like Dr. Hanisch, Dr. Mathews routinely refers his patients requiring general surgery to Dr. Koefoot unless the patients express a contrary preference.

4. Drs. Hanisch and Mathews are the only physicians residing in St. Paul. Dr. Koefoot has worked with Drs. Hanisch and Mathews for many years and has confidence in their ability to assist at surgery and to care for surgical patients postoperatively.

5. Plaintiff Board of Trustees of Howard County Community Hospital is the governing body of Howard County Community Hospital, a not-for-profit corporation organized under Nebraska law. The hospital is a 36 bed acute care hospital located in St. Paul, Nebraska. The hospital is licensed by the State of Nebraska and approved for participation in the Medicare program. Drs. Hanisch, Mathews, and Ko-

efoot are members of the medical staff of the hospital. Since 1970, twenty-one different surgeons have performed surgery at the hospital. The hospital has no requirement that surgeons on its medical staff be Fellows of the American College of Surgeons.

6. Dr. Koefoot has operated at Howard County Community Hospital continuously and on a regular basis since it opened in the mid-1950's. At the conclusion of the operations he performs at Howard County Community Hospital, Dr. Koefoot examines the patient in the recovery room and leaves instructions for the patient's postoperative care. Dr. Koefoot does not see these surgical patients postoperatively unless he is in the community to see other patients, or Drs. Hanisch or Mathews believes it is necessary, but he always remains available for consultation with Drs. Hanisch and Mathews by telephone. Dr. Koefoot expects Drs. Hanisch and Mathews to notify him of any complications that may develop.

7. Both Drs. Hanisch and Mathews have frequent occasion to refer patients to Dr. Koefoot who are subsequently operated upon at one of the Grand Island hospitals where Dr. Koefoot has operating privileges. These patients are operated upon in Grand Island either because their condition requires facilities not available at Howard County Community Hospital or because the patients desire to be hospitalized in Grand Island. Following surgery in Grand Island, Dr. Koefoot manages the postoperative course of his surgical patients by seeing them at least once daily. Dr. Koefoot sees patients hospitalized in Grand Island as often as necessary depending on the situation.

8. Defendant American College of Surgeons (hereinafter "ACS" or "College") is a not-for-profit corporation organized under Illinois law with its principal place of business in Chicago, Illinois. The ACS is a professional association of surgeons and calls its members Fellows.

9. Defendant C. Rollins Hanlon, M.D. was the Director and Chief Executive Officer of the ACS from October of 1969 through October of 1986. As Director, Dr. Hanlon was the ACS's ranking staff member. Dr. Hanlon is an Illinois resident.

10. Defendant Frank Padberg, M.D. is the Director of the Fellowship and Graduate Education Departments of the ACS. Dr. Padberg has responsibility for membership matters and serves as Secretary to the Central Judiciary Committee of the ACS, the body with general supervision and direction of disciplinary matters. Dr. Padberg is an Illinois resident.

11. The ACS was founded in 1913. The policymaking body of the ACS is its nineteen member Board of Regents which functions essentially as a board of directors.

12. The ACS is the preeminent organization of surgical specialists in the world. It has approximately 50,000 members in the United States and Canada. Another 8,000 persons, approximately, are in its candidate group. It is the only surgical specialty organization available to the general surgeon. The ACS is more influential than most other medical organizations, and people around the world look to it for leadership in medical matters. It is a mark of prestige within the medical profession to be a member of the ACS, as well as an assurance to the public that a surgeon is well qualified in his or her field. Many hospitals require either certification by a surgical specialty board or membership in the ACS for hospital operating privileges.

13. The ACS engages in numerous scientific and educational activities. It is involved in the process of hospital accreditation through its membership in the Joint Commission on Accreditation of Hospitals. Certification by an American surgical specialty board and Fellowship in the ACS are widely regarded as comprising the hallmark of a surgeon. In many hospitals ACS membership is considered a significant factor when application is made for hospital staff privileges. Likewise, disciplinary action taken by the ACS against a member can be detrimental to a surgeon seeking hospital privileges.

14. The ACS has promulgated and set standards for the medical education and training of surgeons. The ACS interacts with numerous other medical organiza-

tions, including the American Medical Association, in attempting to shape and direct medical-surgical training and practice in the United States.

15. The ACS engages in advertising and in the distribution of public service announcements which is intended to, and does, enhance the public perception of its members. It publishes a yearbook listing its members which is used for referral purposes.

16. Dr. Koefoot graduated from the medical school at the University of Nebraska in 1947. He did a rotating internship at the Charles T. Miller Hospital in St. Paul, Minnesota. He did a general surgical residence at the Charles T. Miller Hospital and the University of Minnesota which he completed in 1952. Dr. Koefoot is not certified by a surgical specialty board, although, as of 1952, he was eligible for board certification in general surgery.

17. Fellows of the ACS voluntarily agree to conform their surgical practices to the principles, declarations, and bylaws of the ACS by signing a Fellowship Pledge upon application for Fellowship.

18. On June 15, 1954, Dr. Koefoot signed an application for Fellowship in the ACS. By so doing, he agreed to abide by the bylaws of the ACS and by such rules and regulations as may be enacted from time to time, and he subscribed to the Fellowship pledge and declaration as follows:

FELLOWSHIP PLEDGE

Recognizing that the American College of Surgeons seeks to exemplify, develop, and enforce the highest traditions of our calling, I hereby pledge myself, as a condition of Fellowship in the College, to live in strict accordance with all its principles, declarations, and regulations. In particular, I pledge myself to pursue the practice of surgery with thorough self-restraint and to place the welfare of my patients above all else; to advance constantly in knowledge by the study of surgical literature, instruction by competent teachers, interchange of opinion among associates, and attendance on sessions of the important societies and at clinics; to regard scrupulously the interest of my professional brothers and seek their counsel when in doubt as to my own judgment; to render willing help to my colleagues, and to give freely my services to the needy. Moreover, I pledge myself to shun unwarranted publicity, dishonest money-seeking, and commercialism, as disgraceful to our profession; to refuse all secret money trades with consultants and practitioners, makers of surgical appliances and optical instruments, or others; to teach the patient his financial duty to the physician and to urge the practitioner to obtain his remuneration from the patient openly; to make my fees commensurate with the services rendered and with the patient's rights; and to avoid discrediting my associates by taking unwarranted compensation and, specifically, to uphold and practice within the principles of financial relations as established by the College. Finally, I pledge myself to cooperate in advancing and extending, by every lawful means within my power, the influence of the American College of Surgeons.

19. Dr. Koefoot was admitted to Fellowship in the ACS on October 12, 1956. Dr. Koefoot remained a full member of the ACS until his membership was suspended by the Board of Regents on June 9, 1979. On August 1, 1981, Dr. Koefoot was expelled from the membership of the ACS by the Board of Regents. The suspension and subsequent expulsion of Dr. Koefoot followed a determination by the Board of Regents that Dr. Koefoot was engaged in the practice of itinerant surgery.

20. From time to time, the ACS Board of Regents issues policy statements on various aspects of surgery. Official statements from the Board of Regents are published in the *Bulletin* of the ACS, its official publication. The *Bulletin* is distributed to all Fellows of the ACS.

21. In February, 1960, the Board of Regents adopted an official policy on itinerant surgery. That policy was published in the May–June, 1960, issue of the ACS *Bulle-*

*tin.* In part, that policy statement included the following:

> The Regents define itinerant surgery as any surgical operation performed, except one upon a patient whose chances of recovery would be prejudiced by movement to another hospital, in which because of distance from the patient, the operating surgeon must delegate the exacting responsibility for postoperative care to another who by training and experience is not fully qualified to undertake it.
>
> This definition excludes surgical care which cannot be delayed, without hazard to the patient, other necessary operations upon patients who cannot safely be moved to a hospital in which the operating surgeon is in regular attendance, and operations requiring special skills, following which the postoperative care is left to another surgeon who is fully qualified to undertake it.
>
> The limit of the distance from which a surgeon may properly supervise postoperative care must be measured in time rather than in miles. While no specific limit can be prescribed, the Regents believe that a surgeon should be able to reach his patient in a postoperative emergency within a reasonable period of time should this be necessary, and should, if he accepts the responsibility of doing the operation, visit his patient regularly during the period of postoperative care.

22. The ACS adopted the 1960 policy on itinerant surgery after approximately six years of thorough and thoughtful consideration by various ACS-appointed committees.

23. In 1961, the Board of Regents reaffirmed the 1960 definition of itinerant surgery and noted that Fellows engaged in itinerant surgery should become subject to disciplinary action as of January 1, 1963.

24. In the May–June, 1962, issue of the *Bulletin,* the Board of Regents reiterated its admonition that a surgeon should make "regular visits to his patient during the postoperative period" and further stated that the "Regents believe that they must take disciplinary action against those Fel-lows who persist in a practice which is inimical to the welfare of their patients."

25. In June, 1964, the Board of Regents amended the bylaws of the ACS to provide that itinerant surgery would henceforth be a specific cause for disciplinary action. That bylaw provides that the Board of Regents may expel, call for the resignation of, or otherwise discipline any Fellow engaged in:

> [t]he performance of surgical operations (except on patients whose chances of recovery would be prejudiced by removal to another hospital) under circumstances in which the responsibility for diagnosis or care of the patient is delegated to another who is not fully qualified to undertake it.

This bylaw has become generally known as the *itinerant surgery rule.*

26. The ACS bylaws do not define the terms "delegated" or "fully qualified" as they are used in the itinerant surgery rule. The ACS's view has always been that only another surgeon is "fully qualified" within the meaning of the rule.

27. Both before and after making itinerant surgery a specific cause for disciplinary action under its bylaws, the ACS published the policy and the reasons for its adoption in various ACS publications. The ACS did this in an attempt to inform and educate its members about the ACS proscription of itinerant surgery.

28. The ACS adopted the policy against itinerant surgery, amended its bylaws by adding the itinerant surgery rule, made its violation a specific cause for discipline, and began enforcing the rule to further its concern for advancing the science of surgery and the ethical and competent practice of its art. The ACS believes that itinerant surgery is inimical to patient welfare and therefore contrary to ACS purposes.

29. Under the ACS bylaws, disciplinary actions are initiated by the ACS Director, as a matter of his discretion, by referral to the Central Judiciary Committee (hereinafter "CJC"). There is no requirement in the bylaws that a "complaint" must be received before the ACS acts on matters

involving itinerant surgery. The ACS by-laws provide that the CJC shall consist of five Fellows, at least three of whom are members of the Board of Regents. The CJC may dispose of a matter referred it by the Director, either by concluding that no disciplinary action should be taken, or by recommending disciplinary action to the Board of Regents. The actual decision whether or not to impose discipline on a Fellow, following a recommendation by the CJC, rests solely with the Board of Regents. The Board of Regents is in no way bound by the recommendations of the CJC. In practice, however, the Board of Regents almost always follows the CJC's recommendations in discipline cases involving allegations of itinerant surgery. Defendants' Exhibit 4 is a copy of the ACS by-laws.

30. ACS Directors have not generally found broad, unsupported allegations of Fellows practicing itinerant surgery to warrant further investigation by the ACS staff or referral to the CJC. Referrals to the CJC typically follow receipt of specific information about a Fellow's practice by the Director and the Director's attempt to confirm the allegations.

31. The ACS has applied the itinerant surgery rule to offenders since its adoption as a bylaw in 1964. The ACS does not actively search for violators and clearly does not follow up on all "leads" it obtains. The ACS has limited resources to apply to its investigatory and disciplinary proceedings. The ACS does not view itself as a policing organization and to a large extent relies on its Fellows to voluntarily comply with ACS bylaws and principles. Dr. Hanlon more vigorously pursued enforcement of the itinerant surgery rule than did his predecessors.

32. From 1964 until 1985, forty disciplinary cases involving itinerant surgery were referred to the CJC by ACS Directors. Both the CJC and the Board of Regents consistently interpreted the itinerant surgery rule as proscribing the delegation by a surgeon of the postoperative care of his surgical patients to non-surgeons. The key factor used to evaluate whether a surgeon delegated the postoperative care of his surgical patients was the frequency with which the surgeon examined the surgical patients during their convalescence in the hospital. Surgeons who did not regularly visit their patients postoperatively and who instead delegated that responsibility to non-surgeons were found to be in violation of the itinerant surgery rule. Defendants' Exhibit 162 is a summary of the forty disciplinary cases.

33. In February of 1967, the ACS postponed consideration of a Lincoln, Nebraska, surgeon's application for Fellowship because it appeared that the surgeon, Dr. William T. Griffin, was engaging in itinerant surgery. On March 1, 1967, the ACS received a letter signed by twenty-one Lincoln, Nebraska, Fellows, strongly objecting to the ACS's decision to postpone Dr. Griffin's application. Largely as a result of this protest, the Chairman of the Board of Regents, Dr. Wade, appointed a three person Ad Hoc Committee to restudy the language of the bylaws having to do with itinerant surgery. Plaintiffs' Exhibit 98 is a copy of the Ad Hoc Committee's report to the Board of Regents.

34. The report of the Ad Hoc Committee, known also as the Spence Committee, recommended that no change be made in the language of the bylaws dealing with itinerant surgery. The Committee also recommended that the Board of Regents adopt certain guidelines for use by the CJC in evaluating disciplinary matters involving travel by a surgeon to a hospital, or hospitals, other than his "home" hospital. The Ad Hoc Committee report does not recommend that the CJC or Board of Regents approve the practice of delegating postoperative care of surgical patients to non-surgeons, or that they should excuse a surgeon from making regular postoperative visits to hospitalized surgical patients. The Ad Hoc Committee report also does not recommend that the CJC and Board of Regents limit their consideration of disciplinary action to cases where patient well-being has actually been adversely affected, or that an evaluation should be made of the actual quality of care received

by the patients in every instance where a surgeon is accused of itinerant surgery.

35. The Board of Regents voted during their Fall, 1967, meeting, to approve the Ad Hoc Committee's recommendations for the guidance of the ACS staff and the CJC.

36. The approval of the Ad Hoc Committee's recommendations by the Board of Regents did not signal any change in ACS policy regarding itinerant surgery, or constitute a change in the Board of Regents and CJC's interpretation of the itinerant surgery rule.

37. In 1970, the ACS received information alleging that Dr. Koefoot engaged in the practice of fee splitting, a practice prohibited by the ACS bylaws and principles. Dr. Koefoot was invited to appear, and did appear, before the CJC on June 11, 1971. After hearing Dr. Koefoot's explanation of his procedures for billing patients, the CJC informed him that his procedures were contrary to ACS policy. Dr. Koefoot expressed his desire to conform his billing procedures to ACS policy and requested that the ACS send him a letter detailing the procedures he should use. The CJC agreed to Dr. Koefoot's request and recommended that the Board of Regents direct the ACS staff to prepare and send such a letter. On June 12, 1971, the Board of Regents accepted the CJC's recommendation, but added a requirement that Dr. Koefoot permit his financial records to be audited in one year to verify his compliance with ACS policy. The audit of Dr. Koefoot's records determined that Dr. Koefoot had changed his billing practices and was in full compliance with ACS policy. In September, 1972, the ACS closed its inquiry into the allegations of fee splitting made against Dr. Koefoot.

38. At the conclusion of the June 11, 1971, interview before the CJC, and after the CJC had unanimously agreed to the recommendation discussed above in paragraph 37, Dr. Koefoot introduced the subject of itinerant surgery and the following dialogue between Dr. Koefoot, his associate from Grand Island, Dr. Graupner, and the members of the CJC ensued:

*Dr. Koefoot:* Can we spend five minutes talking about something else? In respect to itinerant surgery—I don't know what this Committee's feelings are. It is not on the agenda. It does involve me directly and what is the feeling of this group concerning that practice?

*Dr. Spence:* It is spelled out.

*Dr. Graupner:* For several years I did some so-called itinerant surgery. I haven't been out of town for three and a half years.

*Dr. Dunlop:* Basically, to save lives you have to travel and take care of emergency surgery, but having a man go regularly into a town where there is a Board-certified surgeon and do surgery at a distance and not see his patients postoperatively and turn them over to a general practitioner when there is a man available who can do as good a job—this is itinerant surgery.

*Dr. Koefoot:* What if there is no general surgeon in that community?

*Dr. Dunlop:* Then you get into the medium of distance—is it 25 miles or 50 miles?

*Dr. Koefoot:* I can get to the places I go regularly faster than you can here in Chicago.

*Dr. Dunlop:* We know you have a real problem there with distribution of surgeons.

*Dr. Stinchfield:* How far do you have to go?

*Dr. Koefoot:* I go to three places—St. Paul is 20 miles; Loop City is 40 miles and Broken Bow is 75 miles.

*Dr. Stinchfield:* Who takes care of them when you are not there?

*Dr. Koefoot:* A general practitioner who assists. In Broken Bow, it is my brother. I would never do a gastric resection in Broken Bow.

*Dr. Stinchfield:* Do you see the patients again?

*Dr. Koefoot:* Some patients I never see again but if a complication develops, I drive back to see them again. If I am not supposed to do this, I want to know it now.

*Dr. Graupner:* Forty miles in Nebraska is like fifteen miles in Chicago.

*Dr. Koefoot:* I went to Loop City and did two cases. I left Grand Island at 3:00 in the morning and was back at 7:00 A.M.

*Dr. Dunlop:* We appreciate your coming to Chicago to help in this problem. You will get this in writing.

The CJC did not inform the Board of Regents of Dr. Koefoot's inquiry about itinerant surgery, and the minutes from the June 11, 1971, CJC meeting do not reflect the discussion. Plaintiffs' Exhibit 106 is the complete twenty page transcript of the June 11, 1971, CJC meeting.

39. The dialogue quoted above was an informal discussion following the official business for which the meeting had been called. The members of the CJC expressed neither approval, nor disapproval, upon hearing Dr. Koefoot's description of his practice. Dr. Dunlop's explanation of itinerant surgery, which given the context in which it was made clearly constitutes his personal opinion, is limited to the situation where a surgeon travels to a town with a resident general surgeon. Dr. Koefoot does not travel to communities with resident general surgeons.

40. On June 15, 1971, Dr. William E. Adams, then Assistant Director of the ACS, wrote to Dr. Koefoot pursuant to the Board of Regents' decision described in paragraph 37. Enclosed with the letter was a copy of the ACS policy on itinerant surgery as published in the May–June, 1962, *Bulletin.* Also enclosed was an excerpt from the report of the Ad Hoc Committee to the Board of Regents dated September 29–October 1, 1967. Dr. Adams referred Dr. Koefoot to the 1960 Policy Statement and to the excerpt of the report and specifically advised Dr. Koefoot that the rule against itinerant surgery places emphasis on postoperative care by a qualified surgeon rather then on the distance traveled by the surgeon. In his letter to Dr. Koefoot, Dr. Adams did not assess whether Dr. Koefoot's surgical practice complied with the itinerant surgery rule.

41. At no time prior to 1978 did the ACS investigate Dr. Koefoot's practice to determine whether he was acting in compliance with the itinerant surgery rule. At no time did the ACS advise Dr. Koefoot that this surgical practice was in compliance with the itinerant surgery rule.

42. On November 1, 1974, the ACS adopted the Statements On Principles, which is a revision, codification, and compilation of prior statements of ACS policy. The Statements On Principles were reprinted in the *Bulletin* in January, 1975, and the *Bulletin* was mailed to every Fellow of the College. The Statements On Principles include the following provisions:

I. PRINCIPLES OF PATIENT CARE

  A. The responsibility of a surgeon includes preoperative diagnosis and care, the selection and performance of the operation, and postoperative surgical care.

       .     .     .     .

  It is unethical to turn over the postoperative care of a patient completely to the referring physician.

       .     .     .     .

  C. Itinerant Surgery is Proscribed

  An ethical surgeon will not perform elective surgery at a distance from his usual location without personal determination of the diagnosis and the adequacy of preoperative preparation. He will personally render the postoperative care unless it is delegated to another physician as well qualified to continue this essential aspect of total surgical care.

  The elements of time and distance are not pertinent in determining whether an individual has performed "itinerant surgery", the essential question being whether his patient has been cared for as well as if the operation had been done in the surgeon's "home" hospital. Emergency surgery under such conditions may be necessary, but habitual or even frequent operations performed under these circumstances cannot be condoned. If the condition of the patient permits, and additional skills are required, he should be transported to the medical center where they are available. Not only does itinerant surgery violate ethical relations between

surgeon and patient, but it may also raise serious questions as to ghost surgery.

43. The adoption of the Statements On Principles by the Board of Regents did not signal any change in ACS policy regarding itinerant surgery, or constitute a change in the Board of Regents and CJC's interpretation of the itinerant surgery rule. The Board of Regents and the CJC have consistently interpreted the itinerant surgery rule found in the bylaws and the excerpts from the Statements On Principles quoted in paragraph 42 to proscribe the identical conduct.

44. On August 8, 1977, Dr. William L. Fowles, a physician and surgeon licensed in the State of Nebraska continuously since 1968, applied for Fellowship in the ACS. At that time, Dr. Fowles was associated with Dr. Koefoot.

45. On February 9, 1978, Dr. Frank Padberg, Assistant Director of the ACS, advised Dr. Fowles by letter that the Credentials Committee had decided to postpone his application for Fellowship for one year. Specifically, Dr. Padberg advised Dr. Fowles that the Credentials Committee was concerned that Dr. Fowles' practice at Howard County Community Hospital in St. Paul, Nebraska, might represent itinerant surgery.

46. On February 24, 1978, Dr. Koefoot sent Dr. Padberg a letter requesting that the ACS reconsider Dr. Fowles' application for Fellowship. In that letter, Dr. Koefoot stated:

It has been my impression that itinerant surgery is not traveling 20 miles to perform surgery, but traveling to operate in a community where a trained surgeon is in practice.

Members of the American College of Surgeons in Nebraska, including myself, travel to other communities to do surgery. If you would care to know who they are, I would be more than willing to submit their names.

47. On March 17, 1978, Dr. Padberg responded to Dr. Koefoot's February 24, 1978, letter, enclosing a copy of the ACS Statements On Principles and calling attention to Section I—Principles of Patient Care and specifically to Item C relating to itinerant surgery. Dr. Padberg stated:

Itinerant surgery revolves around non-emergent surgery which is performed in an outlying hospital in which the surgeon may not perform the preoperative evaluation or conduct the postoperative care of the patient who was subjected to a surgical procedure.

In that same letter Dr. Padberg invited Dr. Koefoot to send any formal complaints about surgeons performing itinerant surgery to Dr. Hanlon along with some documentation.

48. In connection with the deferral of Dr. Fowles' application for Fellowship, Dr. Padberg corresponded with Dr. Fowles on March 29, 1978, concerning the nature of his practice with Dr. Koefoot. Specifically, Dr. Padberg inquired about the types of procedures performed at the outlying, rural hospitals, whether Dr. Fowles or Dr. Koefoot personally made postoperative rounds at these hospitals, and, if not, what the qualifications were of the persons making the postoperative rounds.

49. After receiving Dr. Fowles' responses to his inquiries in a letter dated March 31, 1978, Dr. Padberg sent Dr. Fowles a letter dated May 3, 1978, in which he stated:

... it would be my personal opinion that you are engaged in the practice of itinerant surgery in St. Paul and Central City because you neither personally make daily postoperative rounds nor delegate that responsibility to a physican who is as well qualified to continue this essential aspect of total surgical care.

The simple solution would be for you or Dr. Koefoot to make daily postoperative visits on all of your patients since there is no great distance involved.

50. In April, 1978, Dr. Koefoot telephoned Dr. Henry Kammandel, a Governor of the ACS from Nebraska. The ACS Board of Governors acts as a liaison between the Board of Regents and the Fellows, and as a clearing house for the Regents on general assigned subjects and on

local problems. An additional responsibility of the Board of Governors is to elect the members of the Board of Regents. Dr. Koefoot expressed his concern to Dr. Kammandel that the implication of the Credentials Committee refusal to accept Dr. Fowles' application was based on alleged itinerant surgery. Dr. Koefoot asserted that he had been found to be in compliance with the itinerant surgery rule when he was evaluated several years previously. Dr. Kammandel advised Dr. Koefoot that the ACS's prior investigation of his practice had involved allegations of fee splitting, not itinerant surgery.

51. By letter dated May 3, 1978, Dr. Padberg advised Dr. Koefoot that the correspondence he had received regarding Dr. Fowles had raised questions concerning the conduct of Dr. Koefoot's practice. Dr. Padberg requested that Dr. Koefoot answer the following questions: 1) whether he or Dr. Fowles performed the preoperative evaluation and conducted daily postoperative rounds on each patient upon whom he had performed surgery at Howard County Community Hospital and Litzenberg Memorial Community Hospital; 2) whether Dr. Koefoot performed surgery at any hospitals, other than Howard County and Litzenberg Memorial, outside Grand Island, Nebraska; 3) what surgical procedures he performed at each hospital; and 4) if Dr. Koefoot or Dr. Fowles did not personally make daily postoperative rounds, the names and qualifications of the persons who did make rounds of their surgical patients at these hospitals.

52. By letter dated July 20, 1978, Dr. Koefoot advised Dr. Padberg that he did surgery at Fullerton Memorial Hospital, Howard County Community Hospital, and Litzenberg Memorial Community Hospital and that he planned to continue to do so. He enclosed a response to section I, subsection C, of the ACS Statements On Principles, which read, in part, as follows:

> I always see the patient prior to surgery for preoperative diagnosis. Physicians practicing in these communities are individuals I have worked with for the last 18 to 25 years. They are competent, well trained, well educated general practitioners who continue to take refresher courses in order to maintain their competency. Cases I do in these areas are not abdominal perineal resections, gastrectomies, colon resections, but are hernias, gall bladders, hysterectomies and cases that I feel can be taken care of there as well as if I would take care of them here in Grand Island.
>
> Paramedics have been trained in these localities, new hospital facilities have been built and the communities depend on this for support. The medical profession in each community depend on this for survival. In fact, rural health requires individuals like myself to continue to provide medical care for sparsely populated areas. The entire situation involving me is much bigger than myself. It is the entire need of rural health in the State of Nebraska. What I am doing is not only practiced by me, but it is practiced in all areas of the State of Nebraska.
>
> My patients are as well cared for in these communities as if the surgery had been done in Grand Island or any other hospital in Nebraska. I consider each of them my "home" hospital. My surgery in these communities does not constitute itinerant surgery. A preoperative diagnosis of the patient is always made by me and where it is determined the patient will not require additional skills than those available, the surgery is performed by me and follow-up care adequately carried out by the community doctor.

53. On July 27, 1978, Dr. Neal A. Vanselow, Chancellor, University of Nebraska Medical Center, wrote to Dr. Padberg in support of Dr. Koefoot.

54. By letter dated August 24, 1978, Dr. Padberg formally notified Dr. Koefoot as follows:

> [I]nformation has come to the attention of the American College of Surgeons which indicates ... that you may have engaged in the practice of itinerant surgery. Specifically, it is alleged you have performed surgery at Fullerton, Central

City and St. Paul, Nebraska, and have delegated postoperative care to a physician not as well qualified as you to render it.

In that letter, Dr. Padberg invited Dr. Koefoot to appear before the CJC at its meeting in San Francisco, California, on October 13, 1978, to present "such evidence as you deem proper to show that disciplinary action should not be taken against you." Dr. Padberg advised Dr. Koefoot that he may be accompanied by an attorney, and enclosed with the letter copies of the ACS bylaws and Statements On Principles.

55. Dr. Hanlon, the ACS Director, referred Dr. Koefoot's case to the CJC as a result of Dr. Koefoot's own statement that the postoperative care of his surgical patients is "adequately carried out by the community doctor," whom he further described as "competent, well trained, well educated general practitioners." Dr. Hanlon did not consider Dr. Koefoot's testimony before the CJC in 1971 as a basis for the referral. Under the ACS bylaws, referral of disciplinary cases to the CJC falls within the Director's discretion.

56. By a letter dated August 31, 1978, Dr. Koefoot responded to the notification by requesting the ACS conduct a local investigation of his practice rather than have him appear before the CJC in California because, as he stated, "[i]t appears that the only question you now have is that of delegating postoperative care to a physician not as well qualified as myself to render it." According to Dr. Koefoot, the ACS needed to conduct the local survey to personally determine the qualifications of each attending physician.

57. On September 13, 1978, Dr. Padberg advised Dr. Koefoot as follows:

It is the established policy of the American College of Surgeons that a physician who has not been trained in surgery is not as well qualified to render postoperative care as a trained surgeon. Because of this policy, it is not within my authority to authorize a survey of the situation in rural Nebraska, such as you request.

Dr. Padberg further advised that Dr. Koefoot could request the CJC to authorize the inquiry sought by Dr. Koefoot when he appeared before them in October. There is no provision in the ACS bylaws or elsewhere that requires the ACS to ascertain the quality of the diagnosis and postoperative care received by the patients of a Fellow accused of itinerant surgery.

58. On September 27, 1978, Dr. Padberg mailed to Dr. Koefoot a copy of the material concerning him which had been sent to the members of the CJC for their review. That material included the following documents: a summary of the facts of Dr. Koefoot's case prepared by the ACS; a letter dated February 24, 1978, from Dr. Koefoot to Dr. Padberg; a letter dated July 20, 1978, from Dr. Koefoot to Dr. Padberg; a letter dated July 27, 1978, from Dr. Neal Vanselow to Dr. Padberg; a letter dated August 24, 1978, from Dr. Padberg to Dr. Koefoot; a letter dated August 31, 1978, from Dr. Koefoot to Dr. Padberg; and a map of Nebraska, marked with the cities where Dr. Koefoot performs surgery.

59. Dr. Koefoot fully understood the ACS's interpretation of the itinerant surgery rule and the nature of the charges against him prior to the October 13, 1978, hearing before the CJC.

60. On October 13, 1978, Dr. Koefoot appeared before the CJC. Present at the meeting were Dr. Koefoot and five Committee members, Drs. Murray, Connolly, Beahrs, DeVoe, and Sabiston.

61. At the meeting, the CJC had an opportunity to review the materials previously sent to them, additional correspondence in Dr. Koefoot's file concerning this matter, and materials presented by Dr. Koefoot. The CJC did not review or have available the transcript of, or any correspondence related to, the 1971 investigation of Dr. Koefoot's alleged fee splitting activities.

62. Dr. Koefoot presented the CJC with a packet of materials entitled, "Surgical Survey—Rural, Nebraska, September 1978" at the meeting. The survey included maps as well as a list of unidentified Nebraska Fellows and the number of commu-

nities served by each. The survey was taken to ascertain the amount of surgery being performed in Nebraska hospitals by surgeons traveling outside their residential communities to operate. The survey did not indicate whether Fellows of the ACS in Nebraska visit their patients postoperatively, did not identify any Fellows by name, and did not indicate the frequency or the nature of the surgery being performed in each community. The information and documentation for the survey were complied with the help of Senator Frank Lewis, a member of the Nebraska State Legislature.

63. Dr. Koefoot read to the CJC excerpts from the July 27, 1978, letter from Dr. Vanselow.

64. Dr. Koefoot told the CJC that he operates at hospitals in three rural communities: (1) Howard County Community Hospital in St. Paul, twenty miles from Grand Island; (2) Fullerton Memorial Hospital in Fullerton, forty miles from Grand Island; and (3) Litzenberg Memorial Hospital in Central City, twenty miles from Grand Island.

65. Dr. Koefoot informed the CJC that 1) he sees all of the elective surgery patients that he operates upon in the rural communities prior to the day of surgery either in his Grand Island office or at surgical clinics conducted at the rural hospitals; 2) he sees emergency patients only at the time of surgery; 3) he most often does not see postoperatively his patients that were operated upon in the rural communities; 4) he will drive to the rural hospitals if he is informed that there is a problem requiring his presence; and 5) he relies on general practitioners to take care of his surgical patients following operations in the rural hospitals.

66. Dr. Koefoot presented the CJC with his surgical list of operations performed in the rural hospitals from September 1, 1977, to September 1, 1978. The CJC reviewed the list and asked Dr. Koefoot about the procedures he performed in these communities as indicated by the list. Dr. Koefoot stated that if he were in St. Paul or Fullerton to perform another operation, he would visit his other patients if they were still hospitalized. Defendants' Exhibit 248 is the transcript of the October 13, 1978, CJC hearing.

67. Upon request from the CJC, Dr. Koefoot was asked to appear, and did appear, before the Board of Regents of the ACS on October 14, 1978, in San Francisco, California. Dr. Koefoot made essentially the same presentation about the nature of his surgical practice and the practice of surgery by other Nebraska Fellows that he had made the previous day before the CJC.

68. Before making his October 14, 1978, appearance before the Board of Regents, Dr. Koefoot had Dr. Murray, Chairman of the CJC, sign a release preserving all of Dr. Koefoot's rights under the bylaws.

69. By letter dated November 3, 1978, and at the direction of the CJC, Dr. Padberg asked the Chairman of the Nebraska State Advisory Committee, Dr. Coe, to review the surgical survey provided by Dr. Koefoot to the CJC and the Regents. Dr. Coe was asked to make comments and recommendations for possible further investigation of itinerant surgery in Nebraska. Dr. Coe was not asked to evaluate Dr. Koefoot's medical practice.

70. The ACS State Advisory Committees are designed to assist the Board of Regents, the CJC, and the ACS staff in dealing with matters of local concern.

71. During October, November, and December of 1978, Dr. Padberg also communicated with two other members of the Nebraska State Advisory Committee—Drs. Kammandel and McLaughlin—in an effort to learn more about the practice of itinerant surgery in Nebraska. The Advisory Committee members confirmed Dr. Koefoot's assertion that itinerant surgery was widespread in Nebraska.

72. Beginning in October of 1978 and continuing through April of 1979, Dr. Koefoot sought to garner support from the membership of the Nebraska Chapter of the ACS. Dr. Koefoot asked the Chapter to adopt a position on the practice of surgery in rural Nebraska that would be accepting of his type of practice.

73. The subject of itinerant surgery was hotly debated within the Nebraska Chapter as a result of Dr. Koefoot's efforts. A group of younger surgeons strongly supported the existing ACS policy against itinerant surgery.

74. Drs. Padberg and Hanlon were kept fully informed by Advisory Committee members Drs. Coe, Kammandel, and McLaughlin of the debate regarding itinerant surgery that was going on within the Nebraska Chapter.

75. On April 21, 1979, Dr. Hanlon wrote to Dr. Reese, President of the Nebraska Chapter, in an attempt to forestall the passage of a Chapter resolution on the subject of itinerant surgery. Dr. Hanlon reminded Dr. Reese, and through him the Chapter members, that the Board of Regents is vested with the sole policymaking authority within the ACS. Dr. Hanlon cited to the itinerant surgery rule within the bylaws and to the Statements On Principles as the authoritative ACS statements on itinerant surgery. Dr. Hanlon concluded his letter by stating:

I hope it will be possible for the Chapter to avoid taking a step that will confuse the issue and may redound to the disadvantage of all surgeons sincerely interested in maintaining high standards of surgical care.

In part as a result of Dr. Hanlon's letter, the Nebraska Chapter membership voted down the proposed Chapter statement on itinerant surgery.

76. The charges against Dr. Koefoot were considered at a second meeting of the CJC on February 2, 1979. At that time, the CJC was provided with Dr. Koefoot's file which contained: 1) the material previously discussed at the October 13, 1978, hearing; 2) a letter dated December 27, 1978, from Dr. Kammandel to Dr. Padberg, enclosing a copy of the proposed position statement on itinerant surgery circulated within the Nebraska Chapter, and enclosing a December 13, 1978, letter from Dr. Heinke of Scottsbluff, Nebraska; 3) a letter dated December 21, 1978, from Dr. Coe to Dr. Padberg; and 4) a letter dated October 30, 1978, from Dr. McLaughlin to Dr.

Padberg. The letters from Drs. Kammandel and Coe contained harsh comments concerning Dr. Koefoot, however, neither letter questioned Dr. Koefoot's skill as a surgeon.

77. Dr. Koefoot did not receive notice of the second meeting of the CJC and was not given an opportunity prior to the CJC's vote to respond to the new material gathered by the CJC.

78. The CJC voted on February 2, 1979, to recommend that the Board of Regents suspend Dr. Koefoot's membership in the ACS because of his practice of itinerant surgery. The CJC also voted to recommend that Dr. Koefoot be given one year to conform his surgical practice to the ACS bylaws, and that if he did not conform his practice he be automatically expelled from the ACS.

79. The ACS bylaws did not require that Dr. Koefoot be notified of the second CJC meeting. The notice provided to Dr. Koefoot before the October 13, 1978, hearing and the opportunity he was given at that time to present evidence satisfied the procedural rights accorded Dr. Koefoot by the bylaws.

80. The CJC based its recommendation to the Board of Regents on the testimony and other information about his practice provided by Dr. Koefoot at the October 13, 1978, hearing. The CJC did not base its recommendation on any information or material received or reviewed by it after the October 13, 1978, hearing.

81. By letter dated February 6, 1979, Dr. Padberg notified Dr. Koefoot of the CJC recommendation. Dr. Padberg advised Dr. Koefoot that the Board of Regents would meet on June 9, 1979, in Chicago, Illinois, at which time the recommendation for disciplinary action would be considered. Dr. Koefoot was invited to appear before the Board of Regents, accompanied, if he so desired, by his attorney, "to present such evidence as [he deemed] proper to show that the disciplinary action recommended by the Central Judiciary Committee should not be taken against [him]." Dr. Padberg further advised Dr. Koefoot that under the bylaws of the ACS, the

Board of Regents is not bound by the recommendations of the CJC and may impose a lesser or more severe degree of discipline than that recommended by the CJC.

82. By letter dated May 10, 1979, James I. Shamberg, attorney for Dr. Koefoot, requested a copy of the CJC recommendation and information concerning procedures to be followed at the June 9, 1979, hearing.

83. By letter dated May 16, 1979, Paul G. Gebhard, attorney for the ACS advised Mr. Shamberg that the first paragraph of the February 6, 1979, letter from Dr. Padberg to Dr. Koefoot was the recommendation of the CJC. Mr. Gebhard further advised Mr. Shamberg that the ACS would allow a thirty minute presentation by or on behalf of Dr. Koefoot, and that the ACS would allow Dr. Koefoot to bring one or two additional witnesses to make brief presentations within the overall time limit. Mr. Gebhard further advised Mr. Shamberg that the ACS would mail to him, prior to the hearing, the same materials mailed to the Board of Regents prior to the hearing. Finally, Mr. Gebhard indicated that the ACS would send to the members of the Board of Regents prior to the hearing a reasonable amount of pertinent written material supplied by or on behalf of Dr. Koefoot.

84. By letter dated May 22, 1979, Mr. Shamberg advised Mr. Gebhard that thirty minutes would not be sufficient for his presentation to the Board of Regents.

85. On May 29, 1979, Dr. Padberg mailed to Mr. Shamberg and Dr. Koefoot a set of materials that had been sent to the members of the Board of Regents relating to Dr. Koefoot's scheduled appearance before them on June 9, 1979.

86. Prior to Dr. Koefoot's hearing before the Board of Regents on June 9, 1979, Dr. Koefoot and the members of the Board of Regents were sent: 1) a summary of the facts of Dr. Koefoot's case prepared by the ACS; 2) a copy of Dr. Padberg's letter to Dr. Koefoot of February 6, 1979; 3) a copy of Mr. Gebhard's letter to Mr. Shamberg of May 16, 1979; 4) copies of the "Surgical Survey—Rural Nebraska, September 1978" and the surgical list Dr. Koefoot had presented to the CJC on October 13, 1978; and 5) and a transcript of Dr. Koefoot's appearance before the CJC on October 13, 1978. On June 6, 1979, Mr. Gebhard mailed to Mr. Shamberg, at his request, copies of the correspondence the ACS had received in the interim between the meetings of the CJC on October 13, 1978, and February 2, 1978. Copies of these letters were not provided to the Board of Regents, and were described in the written summary provided to the Board of Regents only as "[l]etters received from chairman of State Advisory Committee and other Fellows regarding this problem."

87. On June 9, 1979, Dr. Koefoot appeared before the Board of Regents, accompanied by Mr. Shamberg and five physicians from the State of Nebraska. Dr. Hanisch was among the five physicians. Defendants' Exhibit 277 is the transcript of the June 9, 1979, hearing before the Board of Regents.

88. At the Board of Regents hearing, Dr. Koefoot stated that he performs approximately one-fourth of his general surgery in either Central City, Fullerton, or St. Paul, Nebraska. Dr. Koefoot told the Board of Regents that he always sees elective surgery patients prior to the day of surgery, and that he alone makes the decision whether or not an operation will be performed in Grand Island or in one of the rural hospitals. Dr. Koefoot stated that he delegates postoperative care of his patients operated upon in the rural hospitals to a general practitioner and that he should decide whether or not the general practitioner is capable of caring for Dr. Koefoot's surgical patients following surgery.

89. At the hearing Dr. Koefoot stated, "[s]uspending me from the College is certainly not the answer but changing your interpretation on the statement of itinerant surgery would be most appropriate." At no time did Dr. Koefoot indicate any willingness to alter his practice.

90. At the hearing, Mr. Shamberg asked that the Board of Regents not change the rules, bylaws, or regulations of the ACS but that they consider Dr. Koefoot's case independently and interpret the

itinerant surgery rule and the relevant portions of the Statements On Principles so as to permit Dr. Koefoot to continue his practice without change.

91. Dr. Koefoot testified before the Board of Regents as follows:

I make daily rounds at the hospitals in Grand Island. I generally have somewhere between twenty and twenty-five patients. I also make rounds at the Veteran's Hospital in Grand Island. There are two reasons why I do not make daily postoperative rounds [at the rural hospitals]. It is not necessary to. I am being covered, if you want to speak of it as being covered, by adequate general practitioners that do a capable, honest job. It is not necessary for me to go to Fullerton daily and make rounds; it is not necessary for me to go to Central City daily and make rounds. The second reason, I don't have time. There are two reasons: it is not necessary and I get up at 3:00 o'clock every morning as it is. I can't get up at midnight and travel to all these communities. It is not necessary.

92. Dr. Koefoot also testified that if he performs a hernia operation or hysterectomy in Grand Island, he sees the patient postoperatively every day. If he performs the same operation in one of the rural hospitals, he sees the patients postoperatively only if a problem exists. Otherwise, the patient is discharged by the general practitioner.

93. At the conclusion of the hearing, Dr. Thomas Shires, Chairman of the Board of Regents, advised those present that the hearing had lasted twice the amount of time allowed. Dr. Koefoot thanked the Board of Regents and advised them that he had "nothing further to state."

94. After Dr. Koefoot's presentation, the Board of Regents adopted the recommendation of the CJC. On June 20, 1979, Dr. Koefoot was formally advised by the ACS in a letter from Dr. Padberg that he had been suspended from Fellowship and would be expelled if he did not conform his surgical practice to the itinerant surgery rule of the ACS within one year.

95. On June 17, 1981, Dr. Koefoot was informed in a letter from Dr. John M. Beal, then Chairman of the Board of Regents, that he would be expelled from the ACS on August 1, 1981, if he had not by then demonstrated that his practice was in conformity with the bylaws of the ACS. On July 30, 1981, plaintiffs filed this lawsuit. On August 1, 1981, Dr. Koefoot was expelled from the American College of Surgeons.

96. The disciplinary proceedings involving Dr. Koefoot were conducted in accordance with the ACS bylaws and with past ACS practice. During the course of the proceedings, Dr. Koefoot appeared once before the CJC and twice before the Board of Regents. Dr. Koefoot had a full and fair opportunity to explain to the decision making body, the Board of Regents: 1) the nature of his practice; 2) the general practice of surgery in rural Nebraska; 3) the need for qualified surgeons to travel to outlying hospitals to perform surgery; 4) the qualifications and abilities of the general practitioners to whom he delegated the postoperative care of his patients; 5) the extent that itinerant surgery was practiced in Nebraska; 6) the impact that a cessation of surgery as practiced by Dr. Koefoot would have on rural, community hospitals and on the practice of rural medicine generally; 7) Dr. Koefoot's interpretation of the itinerant surgery rule and the relevant Statements On Principles; and 8) the quality of the care received by his patients.

97. The Board of Regents suspended Dr. Koefoot from Fellowship in the ACS because of his admission that he delegated the postoperative care of patients operated upon in the rural hospitals to non-surgeon general practitioners.

98. The frequency of Dr. Koefoot's postoperative visits to patients in the rural hospitals was not an issue in the disciplinary proceedings because of Dr. Koefoot's admission that, as a matter of course, he did not see those patients during their recuperation in the rural hospitals.

99. Dr. Koefoot performs surgery in the rural hospitals because: 1) he believes that having a fully trained surgeon travel

to rural hospitals to perform surgery greatly increases the quality of surgical care received by rural patients who would otherwise have their operations performed by general practitioners; 2) he believes that the treatment of surgical patients is necessary for rural hospitals to survive and that the continued existence of rural hospitals is essential to ensure overall high quality rural medical care; and 3) he believes that rural patients should be allowed the option of receiving surgical care by qualified surgeons in their local community hospitals.

100. Dr. Koefoot routinely delegates the postoperative care of his rural patients to general practitioners because: 1) he sincerely believes that the general practitioners to whom he delegates postoperative care are fully capable to follow the patients he entrusts to them; and 2) it is the only way he can continue to perform surgery in the rural hospitals while at the same time maintaining his active Grand Island practice and fulfilling the obligations of his elected office—Regent of the University of Nebraska.

101. Dr. Koefoot does not supervise the postoperative care received by the patients whom he does not visit during the course of their hospitalization. Dr. Koefoot relies on the general practitioners to identify post-surgical problems encountered by these patients and to notify him of the situation.

102. Dr. Koefoot was expelled from the ACS because he refused to conform his practice to the ACS bylaws following the suspension of his Fellowship.

103. Dr. Koefoot was not investigated by the ACS staff and the CJC, or disciplined by the Board of Regents because of any bias and/or prejudice against him resulting from his stand on the qualifications of family physicians to carry on postoperative care. The negative opinions about Dr. Koefoot held by Drs. Kammandel and Coe and communicated to Dr. Padberg did not influence, bias, and/or prejudice the ACS staff, the CJC, or the Board of Regents against Dr. Koefoot.

104. No change in the events that transpired during the course of the disciplinary proceedings and no change in its outcome, including the imposition of a lesser sanction, would have caused Dr. Koefoot to change the nature of his surgical practice in the rural communities.

105. Plaintiffs Dr. Hanisch, Dr. Mathews, and Board of Trustees of Howard County Community Hospital were not directly affected by Dr. Koefoot's suspension or expulsion from the ACS.

106. The ACS cannot determine the identity of every person or entity that may be directly or indirectly affected by disciplinary action against its Fellows.

107. Dr. Koefoot continues to perform surgery at St. Francis Hospital, Lutheran Memorial Hospital, and the Veteran's Administration Hospital in Grand Island, Nebraska, and at Howard County Community Hospital in St. Paul, Nebraska.

108. Drs. Hanisch and Matthews continue to practice as general practitioners at Howard County Community Hospital and continue to refer patients requiring surgery to Dr. Koefoot. The Hospital has not closed since Dr. Koefoot's expulsion.

## III. CONCLUSIONS OF LAW

1. The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 and its pendent jurisdiction. Proper venue lies in this district pursuant to 28 U.S.C. § 1391(b).

2. Any finding of fact that can be viewed as a conclusion of law is adopted as such. Any conclusion of law that can be viewed as a finding of fact is adopted as such.

3. The rights of the members of professional associations with respect to suspension and expulsion are governed by state law. Because the parties do not dispute that the substantive law of the forum should be applied to this case, the Court will evaluate the legal effect of its findings of fact in accordance with Illinois law. *National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284–1285 (7th Cir. 1985).

The law of Illinois governing membership rights in voluntary associations such as the ACS is fairly well-developed, but cannot be said to be crystal clear. The Illinois Supreme Court has issued no definitive decision. The Illinois Appellate Courts are far from consistent in their approaches. The Seventh Circuit has been properly hesitant to form any definite opinions concerning the current state of Illinois law, preferring instead to resolve cases on other grounds. This Court would prefer to follow the usual course of stating definitive propositions of law and then citing to one or more cases that directly support those propositions. Unfortunately, Illinois law in this area can be understood only when many cases are read and an attempt to harmonize the decisions is made. If there was an outcome determinative dispute between the parties over the state of Illinois law, the Court would, of course, undertake the most searching legal analysis necessary to resolve the issue. In fact, however, the parties are not in any substantial disagreement over the general state of Illinois law that would require that sort of analysis. The Court has decided to give its conclusions regarding the general state of Illinois law and then to cite all of the opinions that it harmonized to reach these conclusions. The Court will then undertake the task of applying its findings of fact to the law.

4. Under Illinois law the members of voluntary associations and the associations themselves are contractually bound to follow the bylaws, rules, and regulations of the association. By joining the association, a member accepts this obligation as a condition of membership. By accepting the member into the association, the association accepts this obligation as a limitation on its ability to impair the member's status.

In addition to the contractual right, a member of an association acquires another more nebulous right—a right to fundamental procedural protections from the association before the member's status is significantly impaired such as through suspension or expulsion from the association. In a case such as the instant case, involving expulsion of a member as opposed to initial denial of membership, there is no require-ment that the member demonstrate an economic need for membership in the association.

Illinois courts will intervene into a voluntary association's affairs either to protect a member's contractual rights, or to protect a member's right to fundamental procedural protections from the association. An Illinois court will not disturb the substantive decisions made by voluntary associations absent a violation of one or both classes of rights.

The body of law from which the Court reached these conclusions consists of the following cases, including the cases cited within them: *Dannhausen v. Business Publications Audit*, 797 F.2d 548 (7th Cir. 1986); *National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281 (7th Cir.1985); *Duby v. American College of Surgeons*, 468 F.2d 364 (7th Cir.1972); *Van Daele v. Vinci*, 51 Ill.2d 389, 282 N.E.2d 728 (1972) *cert. denied* 409 U.S. 1007, 93 S.Ct. 438, 34 L.Ed.2d 300 (1972); *Kendler v. Rutledge*, 78 Ill.App.3d 312, 396 N.E.2d 1309 (1st Dist.1979); *Treister v. American Academy of Orthopaedic Surgeons*, 78 Ill.App.3d 746, 396 N.E.2d 1225 (1st Dist.1979) *appeal denied* 79 Ill.2d 630 (1980); *Virgin v. American College of Surgeons*, 42 Ill.App. 2d 352, 192 N.E.2d 414 (1st Dist.1963); and *Parsons College v. North Central Association of Colleges and Secondary Schools*, 271 F.Supp. 65 (N.D.Ill.1967).

5. Dr. Koefoot has asserted a number of factual and legal theories in support of his contention that the disciplinary proceedings against him were contrary to Illinois law and should be annulled. The nature of Dr. Koefoot's theories has changed over time. Differing theories are found in the plaintiffs' trial brief which is incorporated into the pretrial order, in the plaintiffs' pretrial proposed findings of fact and conclusions of law, in the plaintiffs' post-trial proposed findings of fact and conclusions of law, and in the plaintiffs' post-trial memorandum. The Court will address each of Dr. Koefoot's many theories separately, beginning with those asserting a breach of the defendant ACS's bylaws. The Court

will then address those theories of Dr. Koefoot that fall under the rubric of violations of his right to fundamental procedural protections. Next, the Court will focus on Dr. Koefoot's waiver and estoppel arguments. Finally, the Court will resolve the claims made by the other plaintiffs over Dr. Koefoot's suspension and expulsion.

■ 6. In his post-trial submissions, Dr. Koefoot raised for the first time a contention that he was entitled under the ACS bylaws to notice of the February, 1979, CJC meeting and an opportunity to appear and present evidence. The Court has already concluded as a matter of fact that the ACS bylaws did not entitle Dr. Koefoot to either notice of, or an opportunity to appear at, this second CJC meeting. Therefore, there is no factual basis for this claim.

■ That is not the only problem with this theory, however. This District's Local General Rule 5.00, at footnote 11, provides "[a]ny theory of liability or defense that is not expressed in a party's trial brief will be deemed waived." Nowhere in the plaintiffs' trial brief, or in their January 12, 1987, pretrial proposed findings of fact and conclusions of law, does Dr. Koefoot even allude to this theory. Additionally, plaintiffs' counsel did not mention this theory in his opening argument on segment two of the trial. The Court concludes that even if the ACS bylaws had entitled Dr. Koefoot to notice and an opportunity to be present at the February, 1979, CJC meeting, this claim was waived under Local Rule 5.00 and Federal Rule of Civil Procedure 16(e).

■ 7. Dr. Koefoot also claims that under the ACS bylaws and other rules he was entitled to an evaluation by the ACS of the quality of medical care actually received by his patients. Dr. Koefoot points to the Ad Hoc Committee report to support this claim. In its findings of fact the Court discussed the genesis of the Ad Hoc Committee and the nature of its report. The Court found as a matter of fact that the recommendations of the committee, later adopted by the Board of Regents, did not call for an evaluation by the ACS of the quality of medical care received by the

patients of every surgeon alleged to be performing itinerant surgery. Because the recommendations did not include such a suggestion, the adoption of the report by the Board of Regents created no such right. The fact that, on occasion, the ACS has inquired into the treatment received by patients at the hands of particular members, does not create a procedural right to such an evaluation under the rules and regulations of the ACS.

■ 8. Dr. Koefoot's last "bylaw" argument is his claim that disciplinary proceedings in cases involving itinerant surgery must be initiated by a complaint received about a member. It is undisputed that Dr. Koefoot's practice was brought to the attention of the ACS by Dr. Koefoot's own letters sent in support of his associate Dr. Fowles. As the Court found in its findings of fact, no "complaint" is required under the bylaws or other ACS rules to initiate an investigation into the practice of itinerant surgery. Dr. Hanlon acted in complete conformity with the bylaws when he referred the matter of Dr. Koefoot's practice to the CJC. This particular claim is without any merit.

■ 9. Dr. Koefoot has put forth six separate arguments, at various times, in support of his claim that the ACS violated his right to fundamental procedural protections when it suspended and ultimately expelled him. The Court will address each argument in a separate paragraph beginning with Dr. Koefoot's claim that the itinerant surgery rule, and more generally the ACS's policy against the practice of itinerant surgery, is vague and fails to give ACS members fair notice of what is expected of them. Initially, the Court concludes that there is no factual basis for this claim. Both the specific bylaw and the relevant portions of the Statements On Principles clearly proscribe the delegation of postoperative care to others not "fully qualified", or as stated in the Principles not "as well qualified", to undertake it. As the Court has found, the ACS's interpretation of these phrases has been consistent. Both the bylaw and the Principles proscribe the

delegation of postoperative care to non-surgeons because of the ACS's view that only other surgeons are fully, or as well, qualified to provide postoperative care. Additionally, the Court has found that the CJC and the Board of Regents have been consistent in their application of this proscription in the disciplinary proceedings brought before them. The Court has also found that the ACS undertook a course of conduct designed to educate its members as to the nature of the proscriptions. Finally, but by no means least important, is the Court's finding that Dr. Koefoot was completely aware at sometime preceding the October, 1978, CJC meeting that the ACS interpreted both the bylaw and the relevant Principles as proscribing delegation to non-surgeons.

Aside from the lack of factual underpinnings for this claim, the Court concludes as a matter of law that the bylaw and the relevant Principles do give fair notice to ACS members that delegation of postoperative care to non-surgeons is proscribed. Both the bylaw and the Principles were written for surgeons, by surgeons. After considering all of the evidence admitted in segment two of the trial, the Court concludes that it would be unreasonable for *an ACS member* to interpret the bylaw or the Principles in a manner contrary to the ACS's official interpretation. This is not to say that the meaning of these regulations would be readily apparent to every person. The Court concludes, however, that the meaning would be readily apparent to every ACS member and that is all that is required.

10. Dr. Koefoot next argues that the ACS changed its interpretation of the itinerant surgery rule sometime between the interview he had with the CJC in June, 1971, and 1978 when he was charged with itinerant surgery. Again, there is no factual basis for this argument in light of the Court's finding that the itinerant surgery rule has been consistently interpreted by the ACS staff, the CJC, and the Board of Regents since it was adopted in 1964. Dr. Koefoot's reference to the 1971 CJC interview, which is discussed in another context below, is unconvincing. As the Court has found regarding the 1971 interview, there was no validation of Dr. Koefoot's method of practice, and no clear explanation of the itinerant surgery rule vis-a-vis Dr. Koefoot's practice, by Dr. Dunlop or any other CJC member. Dr. Dunlop's statement, as evidenced by its own ambiguity and incompleteness, cannot be said to have been a binding statement of ACS policy.

■ 11. Dr. Koefoot's third challenge is an argument that the ACS's irrebutable presumption against the delegation of postoperative care to non-surgeons is unfair. The difficulty with this argument is that it asserts a type of substantive right as opposed to a procedural right. As discussed above, Illinois law guarantees certain fundamental procedural rights to persons such as Dr. Koefoot. Dr. Koefoot has offered no authority that suggests that Illinois law regulates the substance of an association's regulations, at least in the context found here. This is not a case alleging racial, religious, or sex discrimination. In no way can family practitioners or rural surgeons be said to be a suspect class that might be entitled to certain federal or state law protections from even the actions of private persons or entities.

In any event, even if Illinois courts would regulate the substantive content of a voluntary association's regulations, the Court finds that the ACS's adoption and enforcement of the itinerant surgery rule is rationally related to the ACS's legitimate concern with patient welfare. The Court was presented with a great deal of persuasive evidence that surgeons are better able to provide postoperative care to surgical patients than are general practitioners. Therefore, although the Court is not called upon under Illinois law to consider the substantive merit of the itinerant surgery rule, if the Court were called upon it would uphold the rule under the rational basis test.

■ 12. The fourth argument advanced by Dr. Koefoot is his claim that the ACS selectively singled him out for disciplinary proceedings when it had knowledge of the widespread practice of itinerant surgery in

Nebraska. Once again the Court believes it is faced here with a substantive as opposed to a procedural rights claim. This selective enforcement argument exists independently of Dr. Koefoot's other allegations of defective procedures. To the extent that this is an assertion of substantive rights it is beyond the scope of regulation provided by Illinois law.

Another problem with this argument is that the ACS did not "select" Dr. Koefoot for punishment as that term is commonly understood. It was Dr. Koefoot himself who brought the nature of his practice to the attention of the ACS staff by protesting the deferral of Dr. Fowles' application for membership.

It is certainly true that the ACS does not search out the practice of itinerant surgery. It is also true that the ACS has, on occasion, seemingly ignored evidence of the practice of itinerant surgery by its members, including Nebraskan members. However, none of these facts operates to immunize Dr. Koefoot from disciplinary action. No rule of law required the ACS to ignore the direct challenge made to the itinerant surgery rule by Dr. Koefoot. This is particularly true where, as here, the ACS has consistently and steadily brought disciplinary proceedings since the adoption of the itinerant surgery rule in 1964. There has been no non-enforcement policy.

13. Dr. Koefoot's fifth claim is nearly identical to his breach of bylaw theory discussed in paragraph 6. Here he claims that the ACS's failure to give him notice of the February, 1979, CJC meeting and failure to give him an opportunity to appear at that meeting to contest the additional material acquired by the CJC between the first meeting in October, 1978, and the second meeting in February, violated his fundamental procedural rights to confront and attempt to refute the evidence against him. The Court concludes, however, that like his breach of bylaw incarnation of this theory, this claim was waived because it was not presented prior to the conclusion of the trial. Dr. Koefoot simply did not articulate any theory of liability prior to the conclusion of the trial based upon the fact that he was given neither notice of, nor an opportunity to attend, the February, 1979, CJC meeting. Local General Rule 5.00 and Federal Rule of Civil Procedure 16(e) operate to bar this claim.

Even if this claim had been timely made, the Court has found as a matter of fact that nothing received by the ACS from the first CJC meeting in October, 1978, until the second meeting in February, 1979, was a basis for the CJC's recommendation to the Board of Regents. Dr. Koefoot's attendance at the February, 1979, CJC meeting for purposes of answering the newly acquired information would therefore have been unnecessary.

■ 14. Dr. Koefoot's last argument asserting a violation of fundamental procedural protections is his claim that the entire disciplinary process that led to his suspension and expulsion was infected with bias and prejudice against him. Once again, the letters from Drs. Kammandel and Coe that were received by Dr. Padberg during the period of time between the two CJC meetings are offered to show the hostility against Dr. Koefoot. There can be little doubt that these letters are evidence of hostility toward Dr. Koefoot on the part of their authors. However, neither Dr. Kammandel nor Dr. Coe sat on the CJC or the Board of Regents in review of Dr. Koefoot's case. Additionally, the Court has found as a matter of fact that neither letter, and no opinion held by their authors, influenced the CJC or the Board of Regents against Dr. Koefoot. None of the evidence admitted at trial suggests that any member of the ACS staff, the CJC, or the Board of Regents had any dislike or animosity for Dr. Koefoot, or that they were trying to silence Dr. Koefoot's support for general practitioners.

The record in this case reveals that Dr. Koefoot had more than reasonable opportunities to argue his case before the CJC and the Board of Regents. Dr. Koefoot chose to take a stand that he knew was contrary to many years of ACS policy in an attempt to convince the highest levels of the ACS to change its policy against itinerant surgery at least as practiced in rural areas. The

Court believes that Dr. Koefoot acted out of the highest concern for the future of rural medicine as he envisioned it. However, the fact that Dr. Koefoot was ultimately unsuccessful in his quest does not in any way suggest that the CJC or the Board of Regents found against him for improper reasons. The Court concludes that there is no validity to Dr. Koefoot's assertion that the disciplinary proceedings were biased or otherwise unfair.

■ 15. Even if there had been procedural irregularities in the disciplinary proceedings against Dr. Koefoot, they would not have won the day for him. Throughout the entire disciplinary process, beginning with his correspondence with Dr. Padberg in 1978, Dr. Koefoot freely, openly, and proudly proclaimed that he routinely delegated the postoperative care of his patients operated upon in the rural hospitals to non-surgeon general practitioners. At no time during the disciplinary process did Dr. Koefoot ever change this explanation of his practice. The primary value of fundamental procedural protections is to guarantee that the true facts are brought to light. Because the facts regarding the nature of Dr. Koefoot's practice were never in dispute during the entire disciplinary process, the fact finding value of the procedural protections was reduced to nothing. *Duby v. American College of Surgeons*, 468 F.2d 364, 369–370 (7th Cir.1972).

■ 16. Dr. Koefoot's last legal argument revolves around the dialogue between himself and some of the CJC members following the 1971 inquiry into allegations of fee splitting. The entire dialogue is quoted in finding of fact paragraph number 38. Dr. Koefoot argues both that the ACS waived its right to discipline him, and that it is estopped to discipline him because of what transpired during and after the 1971 dialogue.

"Waiver is the voluntary and intentional relinquishment of a known right." *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198 (7th Cir.1985). Dr. Koefoot argues that the ACS waived its rights when the CJC members did not tell him his practice was in violation of the itinerant surgery rule during the 1971 dialogue. The Court concludes that no waiver occured because: 1) the context suggests it was an informal discussion following the formal business of the meeting; 2) Dr. Dunlop had no authority to bind the ACS by his actions; 3) neither Dr. Dunlop, nor the other CJC members, through action or inaction, did anything that could be construed as approval of Dr. Koefoot's practice; and 4) the CJC had no authority under the bylaws to inquire into the possibility that Dr. Koefoot was engaging in itinerant surgery absent a referral from the ACS Director. Because the CJC had no independent investigatory or disciplinary authority, it could not relinquish an investigatory or disciplinary right.

"Estoppel arises when a person, by affirmative or negative conduct, either intentionally or through culpable negligence induces another to believe a material fact. The recipient of the information then relies on the representation and as a reasonable consequence, is misled to his injury." *Doherty v. Kill*, 140 Ill.App.3d 158, 94 Ill.Dec. 630, 634, 488 N.E.2d 629, 633 (1st Dist. 1986). Dr. Koefoot argues that the ACS was estopped to apply the itinerant surgery rule to him in 1978 when it took no action against him in 1971. The Court concludes that no estoppel arose for three reasons. First, Dr. Koefoot has never asserted that he was intentionally induced to continue his practice, or intentionally misled. Therefore, the inquiry is into whether through the 1971 CJC members' action, or inaction, the ACS can be found to be culpably negligent in not proceeding against Dr. Koefoot at that time. The Court finds no culpable negligence for the same reasons the Court found no waiver to have occured, i.e. it was an informal discussion, Dr. Dunlop lacked any authority, Dr. Koefoot was given no express or implied approval, and the CJC itself lacked the necessary authority to act. Additionally, there is no evidence that Dr. Hanlon, the official charged with beginning disciplinary investigations, was ever informed of Dr. Koefoot's inquiry.

The second reason is the Court's conclusion that Dr. Koefoot could not reasonably

have viewed the answers he received to his questions as an approval of his practice. Reliance must be reasonable. The transcript of the dialogue demonstrates the lack of any statements of approval by the CJC members.

Finally, Dr. Koefoot has not explained how he was injured by his reliance. Following the 1971 meeting, Dr. Koefoot continued the same sort of practice he had carried on for at least fifteen years previously. He has never explained how another seven years of identical practice hurt him, or put him in any worse position when the nature of his practice did come to Dr. Padberg and Dr. Hanlon's attention in 1978. The reliance necessary to invoke estoppel must be detrimental and Dr. Koefoot has not shown how continuing his same practice after 1971 injured him.

■ 17. The last legal issue the Court must address is the rights of the other plaintiffs—Drs. Hanisch and Mathews, and the Board of Trustees of Howard County Community Hospital to challenge the ACS's disciplinary action against Dr. Koefoot. These plaintiffs argue that because of their relationship with Dr. Koefoot they were entitled to fundamental procedural protections of their own from the ACS before Dr. Koefoot was disciplined. None of these three plaintiffs was ever a member or an applicant for membership in the ACS. Indeed, none of the three could have qualified for membership because membership is open only to surgeons. The defendants have consistently argued throughout the course of this case that none of the plaintiffs other than Dr. Koefoot has standing under the Illinois law governing membership rights in voluntary associations to challenge Dr. Koefoot's ouster from the ACS.

In support of their claims, these plaintiffs rely on *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), for the proposition that nonmembers of an association have procedural rights if the association intends to deny them a valuable right. The Court agrees with the defendants that *Silver*, a case involving the interrelatedness between the antitrust laws, the Securities Exchange Act of 1934, and the role of the New York Stock Exchange as a self-regulating, quasi-official entity is completely inapposite to the instant case. *Silver* cannot reasonably be viewed as relevant to determining the protection afforded under Illinois law to plaintiffs in positions such as Drs. Hanisch and Mathews, and the Howard County Community Hospital. The Court concludes after reviewing all of the relevant Illinois authorities, that persons in the position of these plaintiffs, i.e. associates of the disciplined member, have no rights of their own to procedural protections from the association vis-a-vis the association's disciplinary proceedings against a member. This is not the same as saying that these plaintiffs have no standing to challenge a member's disciplinary proceedings. The Court concludes only that the legality of the association's actions will be measured solely by the association's fulfillment of *the member's* contractual and other procedural rights. Because the Court has concluded that the ACS did not act in derogation of its member, Dr. Koefoot's rights, the other plaintiffs' Illinois state law claims must fail as well. The Court need not even reach the question of the other plaintiffs' standing in light of Dr. Koefoot's failure to prevail.

Even if Illinois law were to afford independent procedural protections to the associates of the members of voluntary associations, such protections could not reasonably extend to persons such as Drs. Hanisch and Mathews, or entities such as the Howard County Community Hospital. Such protections would necessarily be limited to those persons directly affected by the association's actions. The Court has found as a matter of fact that Drs. Hanisch and Mathews, and the Board of Trustees of the Howard County Community Hospital, were not directly affected by the ACS's disciplinary proceedings against Dr. Koefoot.

## IV. CONCLUSION

For the reasons stated in the Court's conclusions of law and in light of the Court's findings of fact, judgment for the

defendants American College of Surgeons, Dr. C. Rollins Hanlon, and Dr. Frank Padberg and against the plaintiffs Dr. Robert R. Koefoot, Dr. Richard G. Hanisch, Dr. M.D. Mathews, and the Board of Trustees of Howard County Community Hospital will be entered on Count II of the Complaint, segment two of the trial.